No. 87,786

STATE OF KANSAS, *Appellee*, v. PAUL M. BEASLEY, *Appellant*.

(56 P.3d 803)

Opinion filed October 25, 2002.

*Korey A. Kaul*, assistant appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with him on the brief for appellant.

*John H. Taylor*, assistant county attorney, argued the cause, and *Chris Biggs*, county attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Paul M. Beasley appeals his convictions and his sentences for aggravated assault and aggravated battery. He argues that (1) the prosecutor's references to his alleged role in robbing the victim violated his right to a fair trial, and (2) the district court's finding under K.S.A. 2001 Supp. 21-4704a(h) that he used a firearm in the commission of a person felony was made by the district judge by a preponderance of the evidence, thus violating *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

Our jurisdiction arises from a transfer to this court on our motion under K.S.A. 20-3018(c).

Neither of Beasley's arguments is persuasive. We find no error and affirm.

## FACTS

On August 13, 2000, Beasley and a group of men went to the home of Jeffrey Jackson. Jackson testified that Beasley and Shone Owens hit him, kicked him, and threatened him with a gun while

Terrance Williams and Larry King carried away Jackson's stereo, television, VCR, and microwave.

Beasley was initially charged with aggravated robbery, aggravated battery, aggravated intimidation of a witness, and aggravated assault. Two of the charges were dropped. Beasley ultimately faced charges of aggravated assault and aggravated battery, both severity level 7 person felonies. He was convicted of both crimes after a jury trial.

Beasley had a criminal history score of I. The district court found that a firearm was used in the commission of the crimes and, under K.S.A. 2001 Supp. 21-4704a(h), imposed two 12-month prison terms, to be served concurrently.

## DISCUSSION

Beasley contends that the prosecutor committed misconduct requiring reversal by repeatedly questioning witnesses throughout the trial about his role in robbing Jackson and in mentioning the robbery in closing arguments. Beasley did not object to the questioning or the comments at trial.

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. [Citation omitted.] . . . If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. [Citation omitted.]" *State v. Pabst,* 268 Kan. 501, 504, 996 P.2d 321 (2000).

This rule applies to alleged misconduct in questioning a witness as well as alleged misconduct in closing argument. *State v. Diggs,* 272 Kan. 349, 361-62, 34 P.3d 63 (2001).

Beasley was charged with aggravated battery and aggravated assault. He was not tried for the robbery. The facts presented at trial indicated that Williams and King, not Beasley, stole Jackson's property while Beasley and Owens beat Jackson. The prosecutor, in describing the sequence of events in his opening statement, said Williams and King arrived at Jackson's home after Beasley had arrived. The prosecutor continued:

"Those people came to the door while Mr. Jackson was being beaten and threatened. Mr. Beasley, the defendant in this case, said, 'Get the stuff, get his stuff.' Mr. Williams and Mr. King then took the stereo that belonged to the victim in this case, and they took his TV set, they took his VCR, and they took his microwave out of the residence and left with those items, put them in the blue vehicle that they had come in, Mr. Williams and Mr. King, and left the area. Ultimately Mr. Owens, Mr. Catlin and Mr. Beasley got back in the Ford Mustang, and they left also."

The prosecutor asked Jackson, the victim, to describe what had happened. Jackson testified that "somebody" said, "[g]et all that," referring to Jackson's personal property. Harold Turner, Jr., testified that Williams and King later asked Turner to hold the stolen property for them. Turner testified that Beasley was present during this conversation. On cross-examination, Turner admitted he was mistaken about Beasley's presence during the conversation with Williams and King.

On questioning Williams, the prosecutor inquired if Beasley said, "Take the stuff." Williams said he could not remember. The prosecutor pointed out, using a written statement Williams made to police, that Williams said Beasley told King to "grab all the sh_t." Williams' written statement was eventually excluded from evidence because Williams was an unresponsive witness at trial and the evidence in the written report was cumulative.

The prosecutor asked King if Beasley said something about taking Jackson's property. According to King, Beasley said to "get it." Undersheriff Roman testified that Jackson's statement to police included reference to Beasley's saying, "Take this sh_t." Undersheriff Roman also testified that during the course of an interview, Williams said Beasley told Williams and King to take Jackson's property. Undersheriff Roman also clarified on cross-examination that Beasley was not with Williams and King during their conversation with Turner because Beasley was in police custody at that time.

Beasley testified in his own defense. He stated that he was not the one who told Williams and King to take Jackson's property. The prosecutor did not follow up on this statement in cross-examination.

The record reveals that the prosecutor's routine questions were nothing more than an attempt to sketch the sequence of events before, during, and after Jackson's beating. Beasley fails to persuade us that the prosecutor's questioning of witnesses here was improper or amounted to misconduct.

Beasley also complains of Turner's misstatement at trial about Beasley's presence during a conversation in which Williams and King asked Turner to hold the stolen property. This misstatement was corrected on cross-examination of Turner and again during cross-examination of Undersheriff Roman, and it can hardly be attributed to the State.

Next, Beasley argues that the State committed prosecutorial misconduct in closing argument by highlighting Beasley's role in the uncharged robbery. In closing, the prosecutor devoted two paragraphs to Beasley's alleged role in the robbery:

"At some point in time, statement's made, 'Take all that stuff.' And who made that statement? According to Mr. King, the roommate of Mr. Beasley, that statement was made by Mr. Beasley, 'Take this stuff.' The innocent bystander. There was no plan or scheme involved here, just spontaneously taking stuff. Mr. King and Mr. Williams said, oh, okay. And they start taking the stuff out of the residence. Just spontaneous actions.

"Mr. Beasley, the innocent party here, according to his roommate, is the one that said take the stuff. Mr. Williams, in his initial statement to Mr. Roman, said there was a statement about taking the stuff. The victim, in his initial statement to Mr. Roman, said there was a statement about taking the stuff. He didn't know who may have said the statement, but he heard it as well. His own roommate said it was him."

The purpose of the prosecutor's reference to Beasley's role in the robbery becomes clear later in the State's closing argument, when the prosecutor pointed out the differences between the victim's version of events, Beasley's version of events, and other witnesses' testimony. Following the State's closing, Beasley's counsel said:

"If there was a plan involved here, some sort of conspiracy, my client would have been charged with that. State must have been satisfied there wasn't any. Didn't charge my client with theft, stealing that stuff, so evidently the State feels that, in fact, it was, in reality, an accident, just common circumstance that was not necessarily planned."

The prosecutor's remarks about Beasley's alleged statement to Williams and King to "get the stuff" were within the realm of fair comment on the evidence presented at trial. Further, Beasley emphasized in his closing argument that he was not charged with the robbery.

Finally, Beasley argues that the prosecutor erred in "repeatedly referring to a statement specifically excluded by the trial court," referencing Williams' written statement to police. The State points out that any reference in closing to what Williams told Undersheriff Roman was taken from the trial testimony of Williams and Undersheriff Roman, not the written report.

Beasley's arguments that the State committed reversible prosecutorial misconduct lack merit.

### The Apprendi Contention

Beasley contends that K.S.A. 2001 Supp. 21-4704a(h) is unconstitutional because the fact he used a firearm in the commission of his crimes must be proven to a jury beyond a reasonable doubt before that fact can be used to impose a prison term rather than probation. Beasley argues that because the district court here made the required firearm finding by a preponderance of the evidence, his sentence violates *Apprendi* and must be vacated. We disagree.

Beasley's argument requires interpretation of the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*, and is a question of law subject to unlimited review. *State v. Crow*, 266 Kan. 690, Syl. ¶ 2, 974 P.2d 100 (1999).

K.S.A. 2001 Supp. 21-4704a(h) provides that offenders who use a firearm in the commission of a felony shall receive presumptive prison sentences. In *Apprendi*, the United States Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The question becomes whether the district court's conclusion that Beasley used a firearm in the commission of his crimes, triggering a presumptive prison sentence, increased the penalty for his crimes beyond the statutory maximum.

In *State v. Carr*, 274 Kan. 442, 53 P.3d 843 (2002), we considered whether *Apprendi* applies to upward dispositional departures under the KSGA. The majority reasoned that "[p]robation and parole are dispositions alternate to the serving of a sentence, and neither probation nor parole increase or decrease the sentence required to be imposed by statute." 274 Kan. 442, Syl. ¶ 3. A majority of this court concluded that because imposition of a prison term in a presumptive probation case does not increase the sentence beyond the statutory maximum, *Apprendi* does not apply to dispositional departures under K.S.A. 2001 Supp. 21-4716. 274 Kan. 442, Syl. ¶ 5.

We have not considered the question of whether *Apprendi* applies to K.S.A. 2001 Supp. 21-4704a(h). However, in *State v. Garcia* (No. 87,691, this day decided), we relied on *Carr* in holding that *Apprendi* does not apply to K.S.A. 2001 Supp. 21-4704a(k) (presumptive prison term for gang-related crimes).

The district court here, after finding that Beasley used a handgun to commit the crimes, imposed a presumptive prison term. Following the reasoning of *Garcia*, the prison term does not exceed the statutory maximum punishment for Beasley's crime, and *Apprendi* does not apply.

We also note that the jury here found beyond a reasonable doubt that Beasley used a firearm to commit the aggravated assault. The complaint charged that Beasley "did unlawfully, feloniously, willfully and intentionally place another, to-wit: Jeffrey Jackson in reasonable apprehension of immediate bodily harm, committed with a deadly weapon, to-wit: handgun, contrary to K.S.A. 21-3410(a)." The jury convicted Beasley of aggravated assault after being instructed that it must find, among other things, that "the defendant used a deadly weapon[,] to wit: a handgun."

Affirmed.

LARSON, S.J., assigned.

SIX, J., concurring: I continue to adhere to the *Apprendi* analysis expressed by my dissent in *State v. Carr*, 274 Kan. 442, 53 P.3d 843 (2002). However, I recognize my analysis did not persuade a majority of this court. *Carr* controls *Garcia*, and our discussion in *Garcia* requires affirmance of the second issue here.